<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---------------------------------------------------------

| | |
|---|---|
| JOHN EDWARD BELL, DDS, : | |
| : | Civil Action No. 3:16-cv-8006-BRM-DEA |
| Plaintiff, : | |
| : | |
| v. : | |
| : | **REDACTED** |
| CROWN LIFE INSURANCE COMPANY : | |
| and CANADA LIFE ASSURANCE : | **OPINION** |
| COMPANY, : | |
| : | |
| Defendants. : | |

---------------------------------------------------------

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are: (1) Defendants Crown Life Insurance Company ("Crown Life") and Canada Life Assurance Company's ("Canada Life") (collectively "Defendants") Motion for Partial Summary Judgment (ECF No. 17) and (2) Plaintiff John Edward Bell, DDS's ("Dr. Bell") Cross-Motion for Summary Judgment (ECF No. 21). All motions are opposed. Having reviewed the submissions filed in connection with the motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause shown, Defendants' Motion for Partial Summary Judgment is **DENIED in part** and **GRANTED in part** and Dr. Bell's Motion for Summary Judgment is **DENIED**.

## I.  PROCEDURAL AND FACTUAL BACKGROUND

This case involves the denial of insurance coverage by Defendants in connection with a claim submitted by the insured, Dr. Bell. The narrow questions before the Court are whether Dr. Bell can perform in any gainful occupation and whether Defendants exercised "bad faith" in their

denial of Dr. Bell's coverage.

On January 22, 1991, Crown Life[1] issued a disability policy (the "Policy") to Dr. Bell.[2] (ECF No. 26-1 ¶ 1). The Policy provided for a monthly income total disability benefit of $2,500, which increased to $4,900 in 1995 through an automatic benefit adjustment. (ECF No. 21-8 ¶ 2.) Pursuant to the Policy, coverage terminated at 11:59 p.m. at age 65 or on the day the last monthly income benefit was paid, whichever was later. (*Id.* ¶ 4.) Age 65 was defined as the first anniversary of the Policy after the insured's birthday, which, for Dr. Bell, was January 22, █. (*Id.* ¶ 5.) The Policy also included a Lifetime Sickness Benefit Rider which included the following:

> **Age**
> 'Age' means the first anniversary of this policy after each birthday. For example, 'Age 60' means the first anniversary of the policy after Your 60th birthday.

> **BENEFIT PROVISIONS**

> If You are totally disabled due to Sickness at Age 65 We will continue to pay benefits for as long as such Total Disability continues.

> The benefit payable after Age 65 will depend on Your Age when Total Disability began.

---

[1] Canada Life allegedly acquired the majority of Crown Life in 1998 and therefore, the parties will be collectively referred to as Defendants. (ECF No. 1 ¶ 18.)

[2] At the time Dr. Bell obtained the Policy he was an Endodontist, with a primary focus on performing root canal procedures. (ECF No. 21-8 ¶ 3.) For twenty-five years, from 1984 through 2009, Dr. Bell worked as a solo Endodontist in his own practice, employing a receptionist and an assistant, and working with an associate for a brief period in the 1990's. (ECF No. 26-1 ¶ 6.) In 2009, Dr. Bell became an employee of Allied Dental Practices of New Jersey ("Allied Dental"), working 15-20 hours in his own practice and another 15-20 hours at Allied Dental per week. (*Id.* ¶ 8.) "He received forty-five percent of the net receivables for his work on patients of [Allied Dental]." (*Id.*) Dr. Bell treated his last patient on January 29, 2011, due to his visual deficits. (*Id.* ¶ 11.)

| If Total Disability Began Before Age ... | The Percentage of the Monthly Income Benefit Payable Is ... |
|---|---|
| 60 | 100% |
| 61 | .50% |

(ECF No. 1-2 at 10.) Total Disability means

> you are unable, due to injury or Sickness, to engage in the material and substantial duties of Your regular occupation.
>
> This definition changes after benefits have been payable during any one such continuous Disability for the longer of:
>
> (a) 60 months; or
> (b) to Your Age 65.
>
> Total disability will then mean that You are unable, due to injury or Sickness, to perform in any gainful occupation. Any gainful occupation means work for which You are reasonably suited by your education training and experience.

(*Id.* at 5.) Bell's sixtieth birthday was on ▮▮▮▮▮ ▮▮▮, and therefore he was considered Age 60, for purposes of the policy, on January 22, ▮▮▮. (ECF No. 21-8 ¶ 8.)

Around Thanksgiving of 2010, Dr. Bell began experiencing a blind spot in his right visual field. (ECF No. 26-1 ¶ 9.) He scheduled an appointment with Dr. Michael Spedick for December 27, 2010. (*Id.*) However, due to weather conditions he was not seen by Dr. Spedick until February 1, 2011. (*Id.*) On that date, he reported "that his vision was fuzzy on the right, not as vivid or clear as the left for 1-2 months." (*Id.* ¶ 12.) Dr. Spedick diagnosed him with presbyopia, hyperopia, and astigmatism. (*Id.*) He further found that Dr. Bell had a tumor in his right eye. (*Id.*) Based on these diagnoses, Dr. Bell spent the following week consulting several doctors. He saw Paul Wilson, D.O. on February 2, Carol Shields, M.D. on February 7, and Wilson MD on February 8. (*Id.* ¶ 13.) On February 7, 2011, he was more specifically diagnosed with a malignant choroidal melanoma on his retina. (ECF No. 17-3 at 50.) On February 10, 2011, he underwent surgery for his "choroidal melanoma at Wills Eye" and for "removal of radioactive plaque iodine 125 plus transpupillary

3

thermotherapy plus off label Intravitreal Avastin injunction, OD." (ECF No. 26-1 ¶ 13) The parties agree Dr. Bell become "totally disabled" after age 60 but before age 61.[3] (*Id.* ¶ 20; ECF No. 21-8 ¶ 11.) Subsequent to this surgery, Dr. Bell was unable to return to work as an Endodontist. (ECF No. 26-1 ¶ 14.) In fact, Dr. Sara Lally restricted him from performing his regular occupational duties as an Endodontist as of February 10, 2011, due to the choroidal melanoma in his right eye. (*Id.* ¶ 20.)

On February 17, 2011, Dr. Bell notified Defendants of a disability due to eye cancer. (ECF No. 21-8 ¶ 15.) He then submitted a claim for disability benefits under the Policy in March 2011, indicating that on February 1, 2011, he was diagnosed with a tumor in his right eye and that his last day of work was January 29, 2011. (ECF No. 26-1 ¶ 15.) On March 22, 2011, Dr. Bell provided Defendants with records from Ocean Eye outlining his course of treatment and the status of his vision. (*Id.* ¶ 17.) The records indicated an impression of refractive error change in the left eye as well. (*Id.*) On April 20, 2011, Defendants sent Dr. Bell a letter, incurring his claims as of February 10, 2011, and advising him that he would receive a monthly benefit of $4,900. (ECF No. 21-8 ¶ 22.) The claim was then set for bi-annual reviews by Defendants, wherein Dr. Bell was to complete claim forms and attach records from treating physicians. (*See* ECF No. 25-1 ¶¶ 21, 22, 23, 24, 26, 27, 29, 32.)

On June 21, 2011, the Social Security Administration denied Dr. Bell's claims for social security disability benefits, determining that he did "not qualify for benefits on this claim," stating, "your condition prevents you from doing your usual work; however it does not prevent you from doing other types of work requiring less physical effort." (ECF. No. 21-8 ¶ 24.)

---

[3] The parties disagree as to Dr. Bell's "incurred date." Dr. Bell argues it is February 1, 2011, the date he initially treated with Dr. Spedick, and Defendants argue it is February 10, 2011, the date Dr. Bell underwent surgery.

On October 27, 2015, Defendants "reviewed the medical records pertaining to the disability claim of [Dr. Bell]. The purpose of [the] review [was] to provide an opinion regarding the insured's upcoming change of definition." (Ex. 11 to ECF No. 12-3.) Based on their review, they noted:

> [T]he insured could likely return to work in a profession other than patient care dentistry. While he has multiple medical conditions, in my opinion, it is his loss of vision (other than seeing hand motion) with his right eye which results in a level of impairment affecting his ability to perform an occupation. His other conditions do not appear to result in any restrictions or limitations at this time.
>
> His restrictions and limitations due to the impaired vision would include poor depth perception and poor peripheral vision to the right. Otherwise, he appears to be reasonably functional.
>
> Recommendations:
> Consider referral to Occupational Expert regarding potential alternative occupations.

(*Id.*) On December 9, 2015, Defendants sent another letter to Dr. Bell informing him that his "policy [was] approaching a change in definition of Total Disability." (Ex. 13 to ECF No. 12-3.) Specifically, the letter indicated:

> Your current definition of total Disability is as follows:
>
> *Total Disability means that you are unable due to injury or Sickness, to engage in the material and substantial duties of Your regular occupation. This definition changes after benefits have been payable during any one such continuous Disability for the longer of*
> *(a) 60 months, or*
> *(b) Your Age 65.*
>
> Age 65 is defined as the policy anniversary after your 65th birthday. As you turned age 65 on ███████████, it appears the policy anniversary after that would be January 22, ███. As of that date, Total Disability will be defined as:
>
> *"Total Disability will then mean that You are unable, due to Injury or Sickness, to engage in any gainful occupation. Any gainful occupation means work for which you are reasonably suited by Your education, training and experience."*

(*Id.*) The letter added the following and closed Dr. Bell's claim:

> Upon review of your medical files, it has been advised by our medical professionals, that given your current condition, your restrictions and limitations due to impaired vision would include poor depth perception and poor peripheral vision to the right. As such, sedentary and light duty categories of work were explored that could accommodate the above-stated restrictions.
>
> Your professional experience, education and prior income have also been considered and our Occupational Specialist, Paul Kirk, has compiled a list of possible job positions that may be appropriate for you to transition to. As such, he will be contacting you to discuss this matter in more detail. Until then, you may refer to the attached document outlining possible job alternatives.
>
> As you can see in the attached outline, job options that are associated within the field of dentistry and outside the field of dentistry have been suggested to you for possible vocational alternatives. Based on the information provided to date, and the results of these reviews performed, it appears that as of January 22, 2016, you will no longer be eligible for benefits.
>
> Therefore, our check, in the amount of $6,533.33 representing payment for Total Disability-Sickness benefits for the remaining period of December 12, 2015 to January 22, 2016 will be released and sent under separate cover. This is your final payment and your claim will be considered closed.

(*Id.*)

In response, Dr. Bell contacted Defendants informing them that their decision was "obviously . . . based on out of date medical records, that he had developed further visual problems including three eye surgeries, and had developed glaucoma in the left eye." (ECF No. 26-1 ¶ 47.) Therefore, Dr. Bell contacted his physicians to submit additional medical records to Defendants. (*Id.*) Those records were reviewed by Defendants' representative, who recommended "expert review be completed by an ophthalmologist for a better understanding of the insured's restrictions and limitations and return to work prognosis, especially in another occupation." (Ex. DD to ECF No. 21-3.) As such, Dr. Bell's most recent medical records were reviewed by Dr. Howard

Pomeranz who opined that he "could return to an occupation other than endodontist with the vision he presently has." (Ex. EE to ECF No. 21-3.) Consequently, on March 16, 2016, Defendants sent Dr. Bell a letter reaffirming their finding that he is "able to work in another occupation and no longer qualifies for benefits under his policy." (Ex. GG to ECF No. 21-4.)

On July 19, 2016, Dr. Bell filed a letter addressing "the errors" of Defendants denial of his continued benefits, which was supplemented on July 20, 2016, and provided additional medical records to support his claim. (Ex. FF to ECF No. 21-4.) Defendants did not consider this letter to be an appeal. (ECF No. 26-1 ¶¶ 61-62.) Therefore, rather than submitting the claim for review by an independent appeals panel, Dr. Pomeranz performed a second review of the updated record. (*Id.* ¶ 63.) On December 16, 2016, Defendants upheld their denial of Dr. Bell's claim. (Ex. JJ to ECF No. 21-4.)

On October 28, 2016, Dr. Bell initiated this suit against Defendants alleging breach of contract and bad faith. (ECF No. 1.) Defendants filed an Answer on January 4, 2017. (ECF No. 4.) On September 7, 2018, Defendants filed a Motion for Partial Summary Judgment. (ECF No. 17-1.) On September 15, 2018, Dr. Bell responded to the Motion and filed a Cross-Motion for Summary Judgment. (ECF No. 21.)

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*,

455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3rd Cir. 1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010 (1985)); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party bears the burden of persuasion at trial, summary judgment is appropriate only if the evidence is not susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Celotex*, 477 U.S. at 330 (Brennan, J., dissenting). Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the

depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III. DECISION

### A. Breach of Contract

Dr. Bell argues he is entitled to summary judgment on his breach of contract claim because he cannot perform any gainful occupation given his visual impairment. (ECF No. 21 at 7-23.) Defendants argue there is a genuine issue of material fact as to whether Dr. Bell can engage in gainful employment. (ECF No. 26 at 2-12.) The Court agrees with Defendants.

To succeed on a breach of contract claim, Dr. Bell "must prove that A) the parties entered into a contract that contained certain terms; B) the promisee satisfied the terms of the contract; C) the promisor failed to satisfy at least one term of the contract; and D) the breach caused the promisee to suffer a loss." *Cargill Glob. Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 579

(D.N.J. 2010). The parties agree the Policy is a binding contract, but disagree as to whether Defendants breached the terms of the Policy in denying Dr. Bell's disability claim based on a finding that Dr. Bell was not "Totally Disabled" at age 65, since he could engage in "any gainful occupation" for which he is "reasonably suited by [his] education training and experience." (ECF No. 21 at 8 and ECF No. 26 at 3.) In order to determine whether there was a breach of contract, the Court turns first to the meaning and application of the Policy requirement that Dr. Bell be "Totally Disabled" and is thereby incapable of engaging in "any gainful occupation" for which he is "reasonably suited by [his] education training and experience." (ECF No. 1-2 at 5.)

Notably, "when interpreting an insurance contract, the basic rule is to determine the intention of the parties from the language of the policy, giving effect to all parts so as to give a reasonable meaning to the terms." *Id.* (citing *Stone v. Royal Ins. Co.*, 511 A.2d 717, 718 (N.J. Super. Ct. App. Div. 1986); *Tooker v. Hartford Acc. & Indemn. Co.*, 319 A.2d 743, 745-46 (N.J. Super. Ct. App. Div. 1974)). Generally, "insurance policies are liberally construed to afford coverage that any fair interpretation will allow." *Am. Wrecking Corp. v. Burlington Ins. Co.*, 946 A.2d 1084, 1088 (N.J. Super. Ct. App. Div. 2008) (citing *Longobardi v. Chubb Ins. Co. of N.J.*, 582 A.2d 1257, 1260 (N.J. 1990) (citation omitted)). "Consistent with that principle, courts also endeavor to interpret insurance contracts to accord with the objectively reasonable expectations of the insured." *Sealed Air Corp. v. Royal Indem. Co.*, 961 A.2d 1195, 1203 (N.J. Super. Ct. App. Div. 2008) (citations omitted).

Nevertheless, "the words of an insurance policy should be given their ordinary meaning, and in the absence of ambiguity, a court should not engage in a strained construction to support the imposition of liability." *Longobardi*, 582 A.2d at 1260 (citation omitted). The Court's role is not to write for the insured "a better policy of insurance than the one purchased." *Walker Rogge, Inc.*

*v. Chelsea Title & Guar. Co.*, 562 A.2d 208, 214 (N.J. 1989) (citation omitted). However, where a genuine ambiguity exists, it must be resolved against the insurer. *DiOrio v. N.J. Mfrs. Ins. Co.*, 398 A.2d 1274, 1280 (N.J. 1979).

The parties do not dispute the meaning and application of the Policy requirement that Dr. Bell be "Totally Disabled" and is thereby incapable of engaging in "any gainful occupation" for which he is "reasonably suited by [his] education training and experience." (ECF No. 1-2 at 5.) In fact, they both cite to *Bowler v. Fid. & Cas. Co. of N.Y.*, 250 A.2d 580, 585 (N.J. 1969) for such definition. (ECF No. 21 at 8 and ECF No. 26 at 5.) However, they dispute whether Dr. Bell fits within that definition.

"To be totally disabled within the language of such policies a person does not have to be bedridden, or absolutely disabled or paralyzed or completely unable to get about, or unable to carry on any activity whatever." *Bowler*, 250 A.2d at 585 (citations omitted). One is totally disabled if he "is unable to engage in a remunerative occupation, or to do work in some profitable employment or enterprise." *Id.* Several courts "have declared that in order to recover for total disability an insured must show that he made an effort to adapt himself to work other than his regular work and that his condition would not permit, or that he tried to do other work and to secure other employment." *Id.* at 585-86 (citations omitted). "[T]o be barred the insured must be able to do gainful work with reasonable and substantial continuity and regularity." *Id.* at 585. The basic question is "whether the insured may obtain employment in the open labor market either in his previous occupation or such occupation which by education, training and experience he might reasonably be expected to pursue." *Dittmar v. Cont'l Cas. Co.*, 150 A.2d 666, 674 (N.J. 1959).

The medical documentation in this matter is voluminous and inconsistent. Each party points to portions of the record that support their position. By way of example, Dr. Bell relies

heavily on his vocational expert who concluded:

> Dr. Bell's visual impairment has progressed since his claim was terminated and not only has there been more concern with his right (blind) eye but there are also critical issues with his only eye with vision. His left eye has a limited field of vision and requires eye drops frequently; therefore with no vision is one eye, and further limited vision in his other eye, Dr. Bell has a very small field of vision. He is unable to read for more than a few minutes at a time and a nominal amount during the course of a day (in the low-occasional range). He lacks depth perception; he is only able to travel short distances and in only certain type of weather conditions. The inability to frequently perform near-acuity eliminates the possibilities of each and every position mentioned in the vocational attachment as well as any gainful occupation.

(Ex. II to ECF No. 21-4 at 26 (emphasis omitted).) In her addendum report, she reaffirmed her position that Dr. Bell "is permanently disabled and a poor rehabilitation candidate given his age, impairment, and prognosis of his medical condition." (Ex. LL to ECF No. 21-4 at 46.) Dr. Bell further relies on his treating physicians reports for the proposition that due to his legal blindness in his right eye and glaucoma and fatigue in his left eye he is incapable of performing in any gainful occupation. (ECF No. 21 at 9.)

Defendants point to Dr. Pomeranz's reports which reach the opposite conclusion. After reviewing all medical records submitted and Dr. Bell's self-report, on December 2, 2016, Dr. Pomeranz found Dr. Bell

> could return to an occupation other than an Endodontist with the vision he presently has. The current level of visual acuity and visual field in the left eye affected by cataract and glaucoma are not causing loss of visual function to the point of preventing the insured from working in some capacity.

(Ex. 15 to ECF No. 17-3 at 124.) Dr. Bell argues Dr. Pomeranz reports and opinions lack adequate support and rational and are entirely unreliable because he did not consider Dr. Bell's left eye, ignored Dr. Bell's self-reports, and cherry-picked from the medical evidence.  (ECF No. 21 at

12-17.)

However, such arguments are contradicted by Dr. Pomeranz's December 2, 2016 report. In fact, that report references Dr. Bell's self-reports and explains why Dr. Pomeranz disagrees:

> In a statement date 3/11/16, Dr. Bell states that he experiences eye fatigue with minimal use. He states that he cannot use a computer screen, read a book or magazine because eye fatigue and blurry vision increases in just a few minutes. He states that despite corrective lenses, he is constantly blinking and refocusing to accomplish most close up tasks. There is no basis for these symptoms based on eye exam findings.
>
> These symptoms possibly could be caused by dry eyes and/or eye strain from trying to use the two eyes together. Dry eyes and ocular strain due to being monocular are conditions that can be treated (with ocular lubricants and monocular occlusion, for example) and do not result in an absolute restriction/limitation in the ability to read or use a computer.

(Ex. 15 at ECF No. 17-3 at 122.) Moreover, the December 2 report references Dr. Bell's left eye over forty times. (See Ex. 15 to ECF No. 17-3.)

As to Dr. Bell's cherry-picking argument, it is true that an insured "is not entitled to cherry-pick among medical reports, including among its own consulting physicians, disfavor[ing] the claimant at each crossroads." *Morrison v. PNC Fin. Servs. Grp., Inc.*, No. 13-804, 2015 WL 1471865, at *10 (D.N.J. Mar. 31, 2015) (citation omitted); *Culley v. Liberty Life Assur. Co. of Boston*, 339 F. App'x 240, 244–45 (3d Cir. 2009). ("While Liberty may freely rely on its consultants, without giving special deference to the views of treating physicians, neither may it turn a blind eye to faults in the evidence supporting its consultants' opinions.") Here, however, Dr. Pomeranz did not "turn a blind eye to faults in the evidence supporting" Dr. Bell's position. Instead, he acknowledged the evidence but refuted it.

Defendants also rely on Dr. Kincaid's vocational expert report, which concluded Dr. Bell can perform in any gainful occupation, and stated in part:

> The medical records reviewed for this evaluation are in consensus that Dr. Bell's development of choroidal melanoma in his right eye has negatively impacted his functional capacities to perform his job as an endodontist. The medical records are in consensus that Dr. Bell is incapable of performing work which requires binocular vision. Nevertheless, Drs. Howard Pomeranz and Frederick Davidorf, along with Ms. Kathryn keys, opined that Dr. Bell would be capable of finding alternate employment in occupations which do not require fine visual acuity. Dr. Pomeranz stated, "This reviewer opines that the insured could return to an occupation other than Endodontist with the vision he presently has. Visual acuity in the left eye is 20/20 and peripheral vision in the left eye is normal. Therefore, the insured has the visual potential to be able to perform another occupation as long as it is not dependent on having excellent depth perception/peripheral vision in both eyes." Dr. Pomeranz also noted that Dr. Bell may require frequent breaks when reading or using a computer to avoid vision fatigue. Absent any dissenting opinions, Dr. Bell's post-loss of vision in right eye profile was adjusted for the worker trait categories of spatial perception, form perception, and clerical perception, to address the issues with binocular vision.

(Ex. 21 to ECF No. 17-3 at 190.) Contrary to Dr. Bell's argument, Dr. Kincaid reviewed Dr. Bell's self-reports and medical records in his thirty-five-page vocational evaluation, but nevertheless found he could perform in any gainful occupation. (*See* Ex. 21 to ECF No. 17-3.)

Defendants have provided sufficient evidence to create a material question of fact as to whether Dr. Bell can perform in any gainful occupation from which a reasonable jury could find in their favor. Because this Court cannot make credibility determinations or engage in any weighing of the evidence, Dr. Bell's Cross-Motion for Summary Judgment as to the breach of contract claim is **DENIED**.

## B. Bad Faith

Defendants argue Dr. Bell's bad faith claim must be dismissed as a matter of law because they had a "fairly debatable reason" for denying his disability claim, since there are genuine issues of material fact as to Dr. Bell's breach of contract claim. (ECF No. 17-1 at 13-15.) Dr. Bell argues he is entitled to summary judgment on his bad faith claim because Defendants had no "fairly

debatable reason" for denying his disability claim. (ECF No. 21 at 23-29.) In the alternative, Dr. Bell argues that even if Defendants had a "debatable reason" for denying his claim, his bad faith claim should proceed to a jury. (*Id.* at 29-30.)

"The New Jersey Supreme Court has recognized a cause of action for an insurance company's 'bad faith' failure to pay an insured's claim." *Tarsio v. Provident Ins. Co.*, 108 F. Supp. 2d 397, 400 (D.N.J. 2000) (citation omitted). In *Pickett v. Lloyd's*, 621 A.2d 445, 453 (N.J. 1993), the court established a two-part test for determining "bad faith." First, "a plaintiff must show the absence of a reasonable basis for denying benefits of the policy." *Id.* (citation omitted). Then he must also prove that the defendant knew or recklessly disregarded the lack of a reasonable basis for denying the claim. *Id.* However, "an insurance company does not act in 'bad faith' if the plaintiff's insurance claim was 'fairly debatable.'" *Tarsio*, 108 F. Supp. 2d at 401. Pursuant to the "fairly debatable" standard, "a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim." *Pickett*, 621 A.2d at 454. Therefore, under the "fairly debatable" standard, this Court must first determine whether the claimant could establish a right to summary judgment as to the underlying claim. *Tarsio*, 108 F. Supp. 2d at 401. "If factual issues exist as to the underlying claim (i.e., questions of fact as to whether plaintiff is entitled to insurance benefits-plaintiff's first cause of action), the Court must dismiss plaintiff's second cause of action—the 'bad faith' claim." *Id.* The rationale being that "a question of fact permits an insurer to 'fairly debate' an insured's claim." *Id.* As such, this Court must deny a motion for summary judgment, "as a matter of law, as to an insured's bad faith claim, if it finds genuine issues of material fact precluding summary judgment as to the underlying claim." *Id.*

In this matter, the Court has already found Defendants raise genuine issues of material fact

as to Dr. Bell's underlying claim of breach of contract. Therefore, the Court must grant summary

judgment in favor of Defendants as to Dr. Bell's bad faith claim. Accordingly, Defendants Motion

for Summary Judgment as to Dr. Bell's bad faith claim is **GRANTED**.[4]

---

[4] Defendants also seek summary judgment "on the issue that if Dr. Bell is able to prove that he was totally disabled at age 65 then he is only entitled to 50% of the monthly benefit amount." (ECF No. 17-1 at 12 (caps and emphasis omitted). Dr. Bell does not oppose or contest this issue in its opposition and Cross Motion. In fact, Dr. Bell appears to concede the issue in its response to Defendants' Statement of Material Facts:

> **Statement No. 8.** Dr. Bell's 60th birthday was on ████████, and therefore he was considered Age 60 on January 22, ████. . . .
>
> **RESPONSE:** Agree.
>
> Statement No. 9. If Dr. Bell's disability began after January 22, ████ and before January 21, ████, Dr. bell is considered Age 60, which is before Age 61.
>
> **RESPONSE:** Agree.
>
> **Statement No. 10.** If Dr. Bell is already considered Age 60 at the time his total disability begins and he is considered totally disabled due to Sickness at Age 65 under the Policy, the maximum percentage of the benefit amount that he is entitled to is 50% since his disability would have began before Age 61. . . .
>
> **RESPONSE:** Agree.
>
> **Statement No. 11.** On February 1, ████, Dr. Bell was diagnosed with a tumor in his right eye. . . . this was after Age 60 but before Age 61 under the Policy.
>
> **RESPONSE:** Agree. . . .

(ECF No. 21-8 at 3.) To the extent this issue is contested, Defendants may reassert it prior to trial.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Partial Summary Judgment is **GRANTED** as to Dr. Bell's bad faith claim but **DENIED** as to all other respects. Dr. Bell's Cross-Motion for Summary Judgment is **DENIED**.


Date: April 29, 2019                                       */s/ Brian R. Martinotti*
                                                           **HON. BRIAN R. MARTINOTTI**
                                                           **UNITED STATES DISTRICT JUDGE**